UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Graffiti Entertainment, Inc.,

        Plaintiff,

v.

Speed Commerce Inc., Navarre
Distribution Services, Inc., and Does 1-10,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-752 ADM/FLN

___

Andrew D. Winghart, Esq., Winghart Law Group, Redwood City, CA and Larry A Frost, Esq., Paladin Law, PLLC, Bloomington, MN, on behalf of Plaintiff.

Jeffrey R. Ansel, Esq., Winthrop & Weinstine, P.A., Minneapolis, MN, on behalf of Defendants.

___

## I. INTRODUCTION

On September 16, 2014, the undersigned United States District Judge heard oral argument on Defendants Speed Commerce Inc., Navarre Distribution Services, Inc., and Does 1-10's (collectively, "Defendants") Motion to Dismiss [Docket No. 16]. Plaintiff Graffiti Entertainment, Inc. ("Graffiti") opposes the motion. For the reasons set forth below, the motion is granted in part and denied in part.

## II. BACKGROUND

### A. The Named Parties

Graffiti is a Wyoming corporation which acquired the assets, rights, and interests of Graffiti Entertainment, LLC. Am. Compl. [Docket No. 7] ¶ 4. Speed Commerce Inc. ("Speed") is a Minnesota corporation with its principal executive office in Richardson, Texas. Id. ¶ 6. Navarre Distribution Services, Inc. ("Navarre") was a wholly owned subsidiary of Speed until April 2014, when it was administratively dissolved. Id. ¶ 5. Graffiti alleges that a series of

corporate name changes, mergers, and acquisitions demonstrate Navarre was an alter ego of Speed and any liability attributable to Navarre should be legally and equitably assigned to Speed.

**B.     The Factual History**

Graffiti is a software developer founded in 2006. Id. ¶ 11. Graffiti developed and published, among other things, video games for gaming consoles created by Nintendo, Sony, and Microsoft. Id. Graffiti's products were published and manufactured for some of the world's leading video game publishers, including Electronic Arts and Activision. Id. Like many smaller software developers, Graffiti did not directly distribute the products it developed. Id. ¶¶ 12, 17.

On December 6, 2007, Graffiti executed a Distribution Agreement with Navarre. Id. ¶ 32, Ex. A. The Distribution Agreement made Navarre an authorized distributor of Graffiti's products and obligated Navarre to market and sell Graffiti's entire line of interactive video game software. Id. ¶ 16. In effect, Graffiti would sell video games to Navarre which in turn sold the video games to retail outlets including Wal-Mart and GameStop.

In addition to the Distribution Agreement, Graffiti contracted with Universal Funding ("Universal") on or about April 9, 2010 for accounts receivable factoring (the "Factoring Agreement").[1] Id. ¶ 89. The Factoring Agreement supplied Graffiti with essential financing for its daily operations. Id. ¶ 91. Navarre allegedly possessed knowledge of the Factoring Agreement through communications with Graffiti and from tendering payment of Graffiti invoices to Universal. Id. ¶ 85.

The Distribution Agreement required Navarre to remit payment for video games within

---

[1] Factoring is a financial transaction in which a business (like Graffiti) sells its accounts receivable to a third party (like Universal) at a discount. These agreements are sometimes made to help businesses meet present cash needs and finance day-to-day operations.

60 days from receipt of the games.  Id. ¶ 38.  On July 11, 2011, Graffiti issued invoice number 32373 to Navarre for $584,755.20.  Id. ¶ 48.  On July 25, 2011, Graffiti issued invoice number 32374 to Navarre for $146,549.76 (collectively, the "Invoices").  Id. ¶ 49.  Graffiti alleges Navarre failed to tender payment for either invoice.  Without these funds, Graffiti's ability to pay its own creditors suffered.  Id. ¶¶ 48-49, 51.  Moreover, Graffiti alleges the timing of Navarre's failure to pay caused significant financial damage because Graffiti was in the process of a public stock offering.  Id. ¶¶ 78-82.

Graffiti also alleges that beginning on or about October 2011, Navarre employees began misrepresenting the state of Graffiti's inventory to retail vendors.  Id. ¶ 19.  Specifically, Graffiti claims Navarre employees told retail vendors that Graffiti was only providing updates to Reader Rabbit, an existing educational title.  Id.  The vendors were not informed that other Graffiti titles in other game categories were available.  Graffiti asserts these misrepresentations were intended to prevent the sale of Graffiti's products, which would have obligated Navarre to settle outstanding debts owed to Graffiti.  Id. ¶ 21.  These misrepresentations were allegedly motivated by Defendants' assessment that Navarre's agreement with GameStop was unfavorable.  Id. ¶ 23.

In addition to the alleged statements to retail vendors, Graffiti claims Navarre made false and defamatory statements to Universal, Graffiti's factoring provider.  Id. ¶¶ 86-88.  These statements caused a rift in Graffiti's relationship with Universal and prompted Universal to sue Graffiti.  Id. ¶¶ 88-90.  Graffiti claims millions of dollars in damages as a result of losing the day-to-day funding Universal had previously provided.  Id. at ¶¶ 91-92.

Graffiti asserts two claims for breach of contract, alleging Defendants' breached the contract by failing to pay Graffiti for the Invoices (Count I) and violating the confidentiality

3

clause by disclosing terms of the Distribution Agreement to third parties (Count II). Id. ¶¶ 55-68. Graffiti also asserts a claim for breach of the covenant of good faith, alleging Defendants breached the covenant by intentionally rendering impossible Graffiti's further performance of the Distribution Agreement (Count III). Id. ¶¶ 69-82. Further, Graffiti asserts a claim for tortious interference with contract, alleging Defendants' false and defamatory statements to Universal caused a breach of the Factoring Agreement (Count IV). Id. ¶¶ 83-92. Finally, Graffiti asserts a trade libel claim, alleging Defendants' statements to third parties were false and unprivileged (Count V). Id. ¶¶ 93-99. In addition, Graffiti alleges Navarre was an alter ego of the company presently known as Speed and that equity demands any liability of Navarre be legally assigned to Speed. Id. ¶ 9.

Defendants move to dismiss under Rule 12(b)(1) and 12(b)(6). Defendants claim Graffiti lacks standing to sue Navarre for its failure to pay the Invoices because Graffiti sold, assigned, and transferred the Invoices to Universal. Defendants also argue Graffiti's remaining claims must be dismissed because these claims have not been sufficiently pled, and because any damages resulting from the alleged injuries are prohibited by the Limitation of Liability clause in the Distribution Agreement. See id. Ex. A ¶ 9.4.

### III. DISCUSSION

**A.     Dismissal under Rule 12(b)(1) for Lack of Standing**

Defendants' argue Graffiti lacks standing to assert Claims I and III and that those claims must be dismissed under Rule 12(b)(1). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the U.S. Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citation omitted). "The party invoking federal jurisdiction

bears the burden of establishing [standing]." Id. at 561 (citations omitted). "A court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit." Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364 (Fed. Cir. 2010).

Because standing is a jurisdictional requirement, Defendants request dismissal of Count I and III under Rule 12(b)(1) of the Federal Rules of Civil Procedure. A motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction may challenge the complaint either on its face or on the factual truthfulness of its averments. See Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993); Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Defendants attack the factual truthfulness of Graffiti's allegation that it owns the Invoices and has standing to assert claims based on their non-payment. Therefore, Graffiti does not receive the benefits of Rule 12(b)(6)—namely to have only the pleadings considered and to have them construed in their favor. See Osborn, 918 F.3d at 729 n.6. Rather, the Court may consider matters outside the pleadings. Id. (citing Menchaca v. Chrysler Credit Corp., 613 F.3d 507, 511 (5th Cir. 1980)).

In a factual challenge to standing, when a defendant produces facts that call the plaintiff's standing into question, the plaintiff bears the burden of affirmatively demonstrating competent proof that standing exists. Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 444 (7th Cir. 2009) (citing Lee v. City of Chi., 330 F.3d 456, 468 (7th Cir. 2003); Retired Chi. Police Ass'n v. City of Chi., 76 F.3d 856, 862 (7th Cir. 1996), cert. denied, 117 S.Ct. 305 (1996)).

### 1.   Count I - Breach of Contract for Failure to Pay Invoices

Defendants argue Graffiti lacks standing to bring the breach of contract claim in Count I because Graffiti sold, assigned, and transferred the Invoices to Universal. In support of its position, Defendants produced: (1) the Factoring Agreement between Universal and Graffiti; (2)

images of the Invoices showing payment is due to Universal; (3) a Notification Agreement from Universal to Navarre stating payments originally due to Graffiti had been sold and assigned to Universal; and (4) a Settlement Agreement and Release (the "Settlement") executed by Universal and Navarre that discharges nine Graffiti invoices, including the Invoices at issue.[2] Allen Decl. [Docket No. 19] Ex. A; Urness Decl. [Docket No. 20] Ex. A-D.

The evidence presented by Defendants supports the conclusion that Universal, not Graffiti, possesses legal claim over the Invoices. First, the Factoring Agreement grants Universal discretion to purchase the accounts receivable owned by Graffiti. Section 1 of the Factoring Agreement states, in relevant part:

> SECTION 1. Sale and Assignment of Accounts
> 1.1 Purchase of Accounts. [Graffiti] hereby agrees to sell, assign and transfer to Universal, and Universal hereby agrees to purchase, all [Graffiti]'s Accounts which are deemed acceptable by Universal in its sole and absolute discretion; with full power to Universal to collect and otherwise deal with such Accounts as the sole and exclusive owner thereof.

Allen Decl., Ex. A. ¶ 1.1.

Additionally, the Notification Agreement from Universal to Navarre notifies Navarre that payments on any invoices that have not been paid are now to be made payable to Universal. Correspondence attached to the Notification Agreement states, "all payments for [Graffiti] on the statement have been sold and assigned to Universal Funding Corporation." Urness Decl., Ex. C. The Notification Agreement is signed by a representative of Navarre and the President of

---

[2] One imaged invoice produced by Defendants is labeled as Invoice number 32360. This invoice matches the date and total amount due of invoice number 32373, one of the invoices Graffiti references in its Amended Complaint. Because the substance of these differently numbered invoices is identical, they will be treated interchangeably.

Graffiti, Kenneth Hurley.[3]

The Invoices themselves provide further evidence that Graffiti assigned the Invoices to Universal. The Invoices are addressed from, "Graffiti Entertainment, Inc., C/O Universal Funding Corporation," and the name "Universal Funding Corporation" and its associated bank account and routing numbers appear on the bottom of the Invoices. Id. Ex. A, B.

Finally, the Settlement between Universal and Navarre discharges nine outstanding debts owed by Navarre to Universal, including the Invoices. Id. Ex. D.

Defendants rely on the decision in a case with a similar factual context, Apex Digital. Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440 (7th Cir. 2009). In Apex, the Plaintiff sued a distributer for failing to pay for products delivered under the terms of a contract. Apex Digital, 572 F.3d at 442. The defendant responded by producing evidence showing the plaintiff assigned all rights in its accounts receivable to a third party. Id. The Seventh Circuit held that the Plaintiff lacked standing because it "failed to provide any evidence to rebut" the claims that the assignment eliminated its right to sue. Id. at 445 (emphasis in original). Apex, therefore, supports shifting the burden to Graffiti to provide evidence to rebut Defendants' strong evidentiary showing that Graffiti lacks standing.

Graffiti presents little evidence to rebut Defendants' evidence showing Graffiti assigned all rights in the invoices to Universal. Graffiti attempts to demonstrate standing by asserting two

---

[3] The Notification Agreement signed by Navarre is faded to the point of near illegibility; the Navarre signature is the only text that is readable. A clear, unsigned version of the Notification Agreement has been produced by Navarre as evidence of the content of the Notification Agreement. Graffiti has not contested the legitimacy or purported content of the signed Notification Agreement.

instances of injury that resulted from Defendants' breach of the Distribution Agreement.[4]  First, Graffiti avers when Defendants failed to pay the Invoices, Graffiti suffered direct financial harm in the amount of money claimed by the Invoices.  Second, Graffiti claims when Navarre breached the confidentiality provision of the Distribution Agreement, Graffiti was sued by Universal, which obtained a substantial judgment against Graffiti in Washington State Court.

It is well settled that a breach of contract claim cannot rest exclusively on a showing of injury.  See Parkhill v. Minnesota Mut. Life Ins. Co., 174 F. Supp. 2d 952, 961 (D. Minn. 2000), aff'd, 286 F.2d 1051 (8th Cir. 2000) (noting that damages is only one of the four required ingredients in a breach of contract claim).  Graffiti's demonstrations of damages, while essential, are alone insufficient to create standing.

Graffiti's first assertion of standing fails because Graffiti's assignment of the Invoices to Universal extinguished any and all rights Graffiti had to collect payment from Navarre on the Invoices.  Again, in Apex, the Court concluded the Plaintiff lacked standing because it was unable to provide "evidence that the assignment had ended, []or that it was merely an assignment for purposes of collection." Id. at 445.  The same is true here.  Graffiti has not put forward evidence demonstrating it re-acquired the Invoices from Universal or that the initial sale, assignment, and

---

[4] Graffiti also argues two sources of damage above and beyond the amount of the Invoices grant it standing.  First, Graffiti asserts the 20% of the total invoice amount held and never released by Universal as a "reserve" give it standing.  Twenty percent of the Invoices is $146.260.99, which is the amount Universal withheld pursuant to Section 7.8 of the Factoring Agreement.  Allen Decl., Ex. A. ¶ 7.8.  Second, Graffiti argues the monthly factoring interest and attorneys' fees Universal sought in the Washington litigation is further damage sustained that also provides Graffiti standing.  These alleged examples of damage, however, do not address, and much less challenge, Defendants' claim that Graffiti lacks standing.  To demonstrate it has standing to pursue Count I, Graffiti must present evidence that it owns the Invoices in question.  Without more, asserting claims of damage suffered does not create standing for Graffiti.

transfer to Universal was not a complete sale, assignment, and transfer.  Absent a showing that Graffiti has ownership of the Invoices, Defendants' failure to pay the Invoices to Universal does not grant Graffiti standing to pursue Defendants for payment on the same invoices.

The Washington litigation and subsequent bankruptcy in California also does not provide standing for Graffiti to bring suit for non-payment of the Invoices against Defendants.  Graffiti argues Universal successfully obtained a judgment against Graffiti because Defendants failed to pay the Invoices to Universal.  Therefore, Graffiti argues it was damaged by the judgment and now can pursue recovery from Defendants.  Graffiti does not argue, however, that the judgment somehow vested a legal interest in the Invoices to Graffiti.  Rather, the Washington and California litigation further undermine Graffiti's standing because it reinforces the conclusion that Universal, not Graffiti, possessed the legal interest in the Invoices required for commencing litigation.

The judgment Universal obtained in the Washington litigation was the result of legal action Universal commenced against Graffiti and Navarre.  Universal's First Amended Complaint repeatedly references Navarre's liability to Universal premised wholly on Universal's purchasing of Navarre's debt owed to Graffiti.  See Winghart Decl. [Docket No. 26] Ex. 5 ¶¶ 3.4, 3.5, 3.7, 3.10, 4.2.  Moreover, Universal's action in United Sates Bankruptcy Court in California claims Graffiti's former CEO, Kenneth Hurley, falsely represented the Navarre account receivables to Universal by stating, among other things, that the Navarre accounts were not subject to set-offs. Id. Ex. 2 ¶¶ 3.3, 3.6, 4.2, 5.2.  Universal relied on invoice number 32360, one of the Invoices, and Mr. Hurley's representations when it advanced Graffiti over $400,000.  Id. ¶ 3.4.  Universal claimed Navarre failed to timely pay because the inventory that was subject to the invoice number

9

32360 was not selling, and further that returns, markdowns, and chargebacks were expected and authorized under the terms of the Graffiti and Navarre Distribution Agreement. Id. ¶ 3.5.

The Washington and California complaints do not allege Universal sold, assigned, or transferred interest in the Invoices back to Graffiti. The judgment and litigation expenses resulting from these lawsuits do not give Graffiti standing to pursue a claim against Defendants for failing to pay the Invoices. Graffiti's failure to present any rebuttal evidence showing it owned the Invoices leads to the unavoidable conclusion that it lacks standing to pursue its claim in Count I for breach of contract.

### 2. Count III - Breach of the Covenant of Good Faith

Defendants also argue Graffiti lacks standing to pursue Count III because Count III is also premised entirely on the Invoices that were transferred to Universal. However, Graffiti's averments do not tie Count III to Count I. Graffiti has alleged a second breach of contract claim, Count II, asserting Defendants violated the confidentiality clause of the Distribution Agreement. Because Graffiti's first breach of contract claim lacks standing, that claim cannot be the underlying breach of contract claim to support Count III. Therefore, the alleged violation of the covenant of good faith rests on whether Graffiti's other breach of contract claim, Count II, survives this motion. Thus, addressing Count III under the presumptions established in Rule 12(b)(6)—not Rule 12(b)(1)—is proper.

### B. Dismissal under 12(b)(6) for Failure to State a Claim

Defendants argue dismissal of claims under Rule 12(b)(6) is warranted because Graffiti has failed to plausibly plead its claims for breach of contract based on the confidentiality clause (Count II), tortious interference with contract (Count IV), and trade

libel (Count V). In the alternative, Defendants argue Graffiti should be required to provide a more definite statement under Rule 12(e) in support of Count IV. As mentioned above, discussion of Count III under Rule 12(b)(6) is germane.

### 1. Standard of Review

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. Ossman, 825 F. Supp. at 880.

A pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'shown'—'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

### 2. Count II - Breach of Contract Based on Breach of Confidentiality Clause

Graffiti alleges the confidentiality clause in Paragraph 11 of the Distribution Agreement

was breached when Navarre made public and unprivileged statements that resulted in litigation and substantial costs Graffiti was forced to incur.

Paragraph 11 of the Distribution Agreement states:

> **CONFIDENTIALITY.** [Graffiti] and Navarre recognize that the terms of this Agreement and the information provided to the other party pursuant to this Agreement is confidential and each party will take reasonable steps to protect such confidential information.

Am. Compl. Ex. A. ¶ 11. Graffiti avers that Defendants made public and unprivileged statements regarding the Distribution Agreement to third parties. See, e.g., id. at ¶¶ 27-31; 65-86.

Defendants argue that even if these averments are true, as Rule 12(b)(6) presumes, dismissal of Count II is still appropriate because the damages asserted are not direct damages and thus are barred by the Distribution Agreement's Limitation of Liability clause. The Limitation of Liability clause in Section 9.4 of the Distribution Agreement states:

> Limitation of Liability. Neither party, nor any of its directors, officers, or employees, shall be liable to the other for any special, indirect, consequential or incidental damages, including, but not limited to, lost profits, however caused. This limitation shall apply even if such party has been advised of the possibility of such damages or the damages were otherwise foreseeable. This limitation shall not apply to third party claims for which there is an indemnification obligation.[5]

Id. at Ex. A. ¶ 9.4. The effect of this provision, Defendants argue, is that only direct damages are recoverable for any alleged breach of the Distribution Agreement between Graffiti and Defendants. Since the damages asserted by Graffiti are consequential, Defendants continue, Graffiti has failed to state a claim under Rule 12(b)(6). Graffiti argues the Limitation of Liability

---

[5] Graffiti argues the final sentence of the Limitation of Liability clause renders it inapplicable to bar Graffiti's claims. Graffiti's position is misplaced because Graffiti, one party to the Distribution Agreement, is asserting claims against Defendants, the other party to the contract. Because a third party is not pursing claims, the terminal sentence of the Limitation of Liability clause is of no consequence to the claims Graffiti is pursuing in this action.

clause does not preclude advancement of Count II because the Limitation of Liability clause is unconscionable and thus unenforceable.[6]

Direct damages are damages that "arise out of the breach itself." Kleven v. Geigy Agric. Chem., 227 N.W.2d 566, 569 (Minn. 1975). Direct damages can be contrasted with consequential damages, which "do not arise directly according to the usual course of things from the breach of the contract itself, but are rather those which are the consequence of special circumstances known to or reasonably supposed to have been contemplated by the parties when the contract was made." Id. (quoting Despatch Oven Co. v. Rauenhorst, 40 N.W.2d 73, 79 (Minn. 1949). Consequential damages are "not based on the capital or present value of the promised performance but upon benefits it can produce or losses that may be caused by its absence." Porous Media Corp. v. Midland Brake, Inc., 220 F.3d 954, 961 (8th Cir. 2000) (quoting Dan B. Dobbs, LAW OF REMEDIES, 41 (2nd ed. 1993)).

Graffiti avers Defendants breached the confidentiality clause of the Distribution

---

[6] Graffiti's arguments for rendering the Limitation of Liability clause unenforceable due to it being unconscionable are unconvincing for several reasons. Graffiti and Defendants are both experienced in business. See Am. Compl. ¶. Graffiti put forward no evidence that the Distribution Agreement was presented as a non-negotiable, take-it-or-leave-it, contract. Graffiti also failed to provide evidence showing that Defendants were the only distribution source available to deliver Graffiti products to retail outlets. Graffiti was fully able to seek an alternative distribution company to deliver its products if it found the terms of the Distribution Agreement unacceptable. Additionally, both Graffiti and Universal share the benefit of the Limitation of Liability clause. These facts justify concluding the Limitation of Liability provision is enforceable as a matter of law. See, e.g., Int'l Fin. Servs., Inc. v. Franz, 534 N.W.2d 261 (Minn. 1995) (holding that a consequential damage exclusion was enforceable because both parties were merchants and there was no great disparity in bargaining power); Transp. Corp. of Am., Inc. v. Int'l. Bus. Machs. Corp., Inc., 30 F. 3d 953 (8th Cir. 1994) (applying Minnesota law and stating "[a]n exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk that is conscionable as a matter of law").

Agreement by disclosing confidential information to non-parties to the Distribution Agreement. Am. Compl. ¶¶ 67-68. Graffiti alleges Universal commenced litigation as a result of the disclosures. Id. Graffiti stylizes the disclosures as having a "direct and immediate adverse effect on Graffiti, including the determination by [Universal] to commence litigation regarding the unpaid invoices." Id. at ¶ 28. Defendants argue the litigation expenses Graffiti claims in Count II are special or consequential damages. At this early stage in the litigation, it is premature to determine whether Graffiti's alleged damages here are direct or consequential. Without drawing any conclusions on the merits, Graffiti has plausibly alleged that the litigation costs it incurred due to Defendants' disclosures "arise out of the breach itself." Accordingly, Count II of the Amended Complaint plausibly pleads a cause of action and dismissal is therefore denied.

### 3. Count III - Breach of the Covenant of Good Faith

A claim alleging the breach of the covenant of good faith requires pleading a breach of contract claim. TCF Nat. Bank v. Market Intelligence, Inc., No. 11-2717, 2012 WL 3031220, at *9, (D. Minn. July 25, 2012). Having concluded that Graffiti has plausibly pled a breach of contract claim premised on violations of the confidentiality clause, the next issue is the viability of Count III.

Minnesota implies a covenant of good faith in every contract. See Minn. Stat. § 336.1-304 (2014). This covenant requires that one party may not unjustifiably hinder the other party's performance of the contract. Teng Moua v. Jani-King of Minnesota, Inc., 810 F. Supp. 2d 882, 893 (D. Minn. 2011) (quoting In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1955)). Prevailing on this claim requires a party to establish bad faith by showing the adverse party has an ulterior motive for refusing to perform a contractual duty.

Minnwest Bank Central v. Flagship Properties LLC, 689 N.W.2d 295, 303 (Minn. Ct. App. 2004) (citations omitted).

In Semler Const., Inc. v. City of Hanover, a development company obtained contractual approval from the city to subdivide and develop an area of land. 667 N.W.2d 457, 459 (Minn. Ct. App. 2003). Later, after elections changed the members of the city council, the city ordered the development company to cease performing work it was undertaking in connection with the previously approved development. Id. at 460, 467. In determining the development company's good faith claim remained viable after the city's summary judgment motion, the Court stated good faith requires parties to "not unjustifiably impede[] the other party from performing its obligations under the contract." Id. at 467 (citing In re Hennepin Cnty., 540 N.W.2d at 502). Ordering the development company to halt construction clearly impeded the development company's ability to perform its obligation of the construction contract.

Graffiti does not plausibly plead a violation of the covenant of good faith. Graffiti argues that Defendants' failure to pay the Invoices and disclosing terms of the Distribution Agreement to third parties rendered Graffiti's performance of the Distribution Agreement impossible. Graffiti's obligation to the Distribution Agreement, however, is to provide marketable software for Defendants. Graffiti does not demonstrate such a connection between the Defendants' conduct and Graffiti's performance of the Distribution Agreement. Graffiti does not allege Defendants' actions impeded their ability to make marketable software available. Rather, Graffiti's sweeping allegations only state that Defendants caused them "financial ruin" from claims asserted against Graffiti by their vendors and suppliers. Am. Compl. ¶¶ 73-75. These claims, however, do not plausibly satisfy the pleading requirements for alleging a breach of the covenant of good faith.

Count III is therefore dismissed.

    **4.**    **Count IV - Tortious Interference with Contract**

Graffiti argues Defendants' disclosures of knowingly false information to third parties tortiously interfered with its contract with Universal, resulting in financial harm to Graffiti. Defendants argue dismissal of this claim is warranted because Graffiti failed to plausibly state its claim.[7] In the alternative, Defendants argue Graffiti should be ordered to provide a more definite statement under Rule 12(e).

Under Minnesota law, succeeding on a claim of tortious interference with contract requires proving: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." E-Shops Corp. v. U.S. Bank Nat. Ass'n, 678 F.3d 659 (8th Cir. 2012) (citing Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982)).

Graffiti fails to adequately allege at least one of the required elements: intentional procurement of a contract's breach. The alleged statements and actions as to this element lack requisite particularity. Without the required particularity, Defendants are unable to reasonably prepare a response. See Tinder v. Lewis County Nursing Home Dist., 207 F. Supp. 2d 951, 959 (E.D. Mo. 2001) ("When examining whether a more definite statement is required under Rule 12(e), the only question is whether it is possible to frame a response to the pleading.") If Graffiti

---

[7] Defendants' also argue that Count IV should be dismissed because any remedy available would be barred by the Limitation of Liability clause. This argument is unavailing because any liability of Defendants from this claim would not flow from the Distribution Agreement and would thus not be limited by any provision. See Superior Edge, Inc. v. Monsanto Co. 964 F. Supp. 2d 1017, 1043 (D. Minn 2013) (noting that Minnesota law recognizes the tort for interference with an existing contract).

possesses facts sufficient to plead its tortious interference claim, it should be afforded an opportunity to do so. Extending an opportunity to plausibly establish Defendants' intentionally procured the breach of Graffiti Entertainment's contract with Universal under Rule 12(e) is appropriate.

### 5.     Alter Ego

Graffiti argues it should be allowed to pursue its claims not only against Navarre but also against Speed under an alter ego theory. Defendants claim Graffiti has failed to plausibly present its alter ego theory and Speed, an entity Graffiti has no relations with, should be dismissed from this lawsuit.

State law governs Graffiti's alter ego claim. Hopkins v. Trans Union, L.L.C., No. 03-5433, 2004 WL 1854191, at *4 (D. Minn. Aug. 19, 2004). In Minnesota, there is a "presumption of separateness" between a parent and subsidiary corporation. Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc., 553 N.W.2d 446, 449 (Minn. Ct. App. 1996) (citation omitted). However, "[p]iercing the corporate veil is an equitable remedy that may be applied in order to avoid an injustice." Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009) (citation omitted). "A court may pierce the corporate veil . . . [if] the party is the alter ego of the entity. When using the alter ego theory to pierce the corporate veil, courts look to the reality and not form, with how the corporation operated." Id. (citations omitted).

Minnesota employs a two-prong test to decide whether a shareholder—or subsidiary—can be liable for corporate obligations:

> The first prong focuses on the shareholder's relationship to the corporation. Factors that are significant to the assessment of this relationship include whether there is

> insufficient capitalization for purposes of corporate undertaking, a failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of the corporation as merely a facade for individual dealings. The second prong requires showing that piercing the corporate veil is necessary to avoid injustice or fundamental unfairness.

Barton v. Moore, 558 N.W.2d 746, 749 (Minn. 1997) (citing Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979)); see also Assoc. of Mill & Elevator Mutual Ins. Co., 553 N.W.2d at 449–50 (applying same factors to parent-subsidiary analysis).

At the pleading stage, claims against corporate defendants have been permitted to proceed when basic allegations as to one or more of these factors have been raised. C.H. Robinson Worldwide, Inc. v. U.S. Sand, LLC, No. 13-1274, 2014 WL 67957, at *8 (D. Minn. Jan. 8, 2014). In Bank of Montreal v. Avalon Capital Grp., Inc., an alter ego theory survived a motion to dismiss predicated on allegations of insolvency, corporate form abuse, fraud, and more. 743 F. Supp. 2d 1021, 1031 (D. Minn. 2010). Graffiti supplies similar contentions.

Here, Graffiti alleges that prior to September 3, 2013, Speed was known as Navarre Corporation, a Minnesota corporation with its principal executive office in New Hope, Minnesota. Am. Compl. ¶ 6. On September 25, 2012, Navarre Corporation formed SFC Acquisition Co., Inc. ("SFC"), a Minnesota corporation. Id. at 7. On November 20, 2012, SFC merged with the Delaware corporation Speed FC, Inc. to form SpeedFC, Inc. ("SpeedFC"), a Minnesota Corporation. Id. On September 13, 2013, SpeedFC filed a name change with the Minnesota Secretary of State to be known as Speed Commerce Corporation. Id. A merger between Speed Commerce Inc. and Speed Commerce Corporation has not been identified.

Graffiti's allegations are deemed sufficient to present a viable alter ego claim at this stage

of the lawsuit. Graffiti details the corporate status of the Defendants—including name changes, corporate mergers and dissolutions and subsidiary information—and alleges instances of corporate form disregard, insufficient funding, and corporate representations of employees. Id. ¶¶ 5-10. These averments, if true, establish the existence of more than one factor under the first prong of the Victoria Elevator test. Graffiti's allegations are more robust than Tiger Team Techs., Inc. v. Synesi Grp., Inc., where dismissal of an alter ego claim was granted where no evidence showed the alleged instrumentality "failed to observe corporate formalities, failed to pay dividends, failed to keep corporate records, or siphon[ed] [] funds. . . ." No. 06-1273, 2009 WL 749814, at *4 (D. Minn. Mar. 18, 2009), aff'd, 371 Fed.Appx. 90 (Fed Cir. 2010). Moreover, the second element of the analysis, "necessary to avoid injustice or fundamental unfairness," is alleged by the averment that Navarre Distribution, the signatory to the Distribution Agreement, was "underfunded" and "lacked sufficient funds" to comply with the Distribution Agreement. Am. Compl. ¶ 10. Buttressed by the complexity these claims present, it is too early to dismiss Graffiti's alter ego claim. See Ahim v. Rooney, 274 Minn. 259, 143 N.W.2d 65, 69 n.1 (1966) (noting that, even at summary judgment stage, alter ego claims usually should not be disposed of due to the complex issues involved).

  **6.**   **Count V - Trade Libel**

At oral argument, counsel for Graffiti conceded dismissal of Count V is proper because Graffiti has been unable to conclusively identify any libelous conduct that occurred within the statute of limitations. Therefore, dismissal of Count V is warranted.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Speed Commerce Inc., Navarre Distribution Services, Inc., and Does 1-10's Motion to Dismiss [Docket No. 16] is **GRANTED IN PART and DENIED IN PART**, as follows:

1. Counts I, III and V of the Amended Complaint [Docket No. 7] are **DISMISSED**.

2. Dismissal as to Counts II and IV of the Amended Complaint is **DENIED**.

3. Dismissal of Alter Ego Liability as to Navarre Distribution Services, Inc. and Speed Commerce, Inc. is **DENIED**.

4. Graffiti Entertainment, Inc. must file a More Definite Statement for Count II by November 19, 2014 or Count II will be dismissed at that time.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 6, 2014.